IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

SCOTT MCCARTY,

      Plaintiff,

vs.                                        CASE NO:  5:25-CV-003

                                   District Judge:  Lisa G. Wood

CSX TRANSPORTATION, INC.

      Defendant.

---

## SECOND AMENDED COMPLAINT

Plaintiff, Scott McCarty (hereinafter "Plaintiff" or "McCarty"), by and through his attorneys of record, Alisa D. Wilkes, Esq. and Chester H. Lauck, III, and for his second amended complaint, filed pursuant to FRCP 15, against the defendant, CSX Transportation, Inc., (hereinafter "CSX" or "Defendant") for damages and all available relief under the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109, and adding a second count for damages pursuant to the Federal Employers Liability Act, 45 U.S.C. §51, *et seq*., hereby states the following:

## COUNT I

## THE FEDERAL RAIL SAFETY ACT ("FRSA")– 49 U.S.C. §20109

1.  Adverse employment actions consisting of a negative performance review, harassment, hostility, and termination from his management position were made by

CSX against Scott McCarty in retaliation for his voicing complaints and reporting safety hazards relating to work conditions, the inability to establish communications with upper-management employees related to safety issues, seeking safe accommodation for his known medical condition of PTSD, and filing a FRSA whistleblower retaliation claim with OSHA on May 31, 2024. CSX knew that Plaintiff had or was about to engage in protected activity when he was terminated from his supervisor position.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction in this case pursuant to the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §20109(d).

3.  Plaintiff filed an administrative action with the Secretary of Labor on May 31, 2024 within 180 days of the retaliatory adverse actions in violation of the FRSA. Plaintiff amended his administrative complaint to add allegations regarding his termination with the Secretary of Labor. After this case was pending for over 210 days without a final decision from the Secretary, Plaintiff filed this action in the Southern District of Georgia pursuant to §20109(d)(3)-(4).

4.  This Court is the proper venue for this case pursuant to 28 U.S. Code §1391 (b), because a substantial part of the events or omissions giving rise to the claim occurred at or near Waycross, Georgia, in the Southern District of Georgia, where Plaintiff was working when a substantial part of the adverse actions by upper-level

management occurred, including reprimand, hostility, being written a poor performance review, and termination. Furthermore, Waycross, Georgia is the location of McCarty's Director, Ronald Cato, was located when he engaged in retaliatory actions and omissions against McCarty.

## PARTIES

5.  The address of CSX is 500 Water Street, Jacksonville, Duval County, Florida 32202. CSX is an interstate freight railroad company subject to FRSA 49 U.S.C. §20109.

6.  McCarty is a citizen and resident of Clay County, Florida.

## FACTS SUPPORTING CAUSE OF ACTION UNDER
## FRSA 49 U.S.C. §20109

7.  McCarty was employed by CSX as a System Production Teams Supervisor in July 2022.

8.  McCarty worked as a System Production Teams Supervisor until January 26, 2024, when he sought medical leave for an exacerbation of Post Traumatic Stress Disorder resulting from adverse actions taken against him in retaliation for reporting safety concerns to CSX management, human resources and ethics departments.

9.  Upon being released by his doctor to return to his management position Ronald Cato, Mr. McCarty's director, terminated him. This termination came shortly after CSXT received notice of Mr. McCarty's intent to file an FRSA claim or of actual filing of the claim.

10. McCarty engaged in activities protected under FRSA during his tenure as a System Production Teams Supervisor up to February 2024, by raising safety complaints to CSX.  The complaints included mechanical problems with equipment, track time issues, harassment by management, clarification on rules and regulations, unsafe work conditions, lack of manpower, supply shortages, work methods, and communication breakdowns affecting safety that McCarty made in good faith due to his belief that the issues created an unsafe work environment. CSX had actual and constructive knowledge of these complaints. These protected activities engaged in by McCarty ultimately resulted in adverse actions on the party of CSX in February of 2024 and again on July 2, 2024. The protected activities include, but are not limited to the following particulars in which McCarty raised and reported safety concerns with upper-level management:

a. In approximately June of 2023, McCarty complained to Director Ronald Cato regarding the need for getting GPS on the work vans, because he was concerned about a particular employees using the van on non-company time and driving at erratic speeds.

b. McCarty reported to Josh Brass in June of 2023 about a lack of support and communication from Director Ronald Cato regarding safety issues and the concern about his manner of addressing safety

concerns that were raised to him as being an unsafe intimidation tactic.

c. In approximately October 2023, McCarty raised a safety concern with Mr. Cato while working in Pensacola, Florida relating to Dennis Rhodes, a management employee, who showed up to the job very disheveled and smelling of alcohol.

d. In October and/or November of 2023, McCarty was working in Bainbridge, Georgia under Bobby Nichols territory. McCarty reported concerns about Mr. Nichols to CSX Director Ronald Cato regarding Mr. Nichols appearing to be mentally unfocused, distracted, and unengaged with his management duties.

e. During this same timeframe, McCarty called Mr. Cato while working in Nashville, TN about an employee who seemed to have issues recently with stumbling and falling on the ballast and was a safety concern for himself and others.

f. Several times throughout end of 2023 and February of 2024, McCarty's team was having mechanical and electrical problems with the tamper rebuild shipped to the crew from a company named Plasser. It was a safety concern that McCarty feared would cause a collision, or an electrical injury for the operator. McCarty called Mr.

Cato to seek help getting CSX mechanical employees, and Plasser engineers out there to troubleshoot the problems with the tamper.

g. Throughout the time frame of June of 2023 to February of 2024, McCarty raised concerns to Mr. Cato relating to repeated delays and cutbacks on safety supplies causing low on an almost monthly basis, the safety concerns were either ignored or met with reprimand and hostility.

h. Throughout the time frame of June of 2023 to February of 2024, McCarty several times raised concerns to Ronald Cato regarding how machine operators were rushed out of the "hole" to begin work without giving them the proper amount of time to inspect their machines for the start of the day.

i. McCarty followed the accepted practice of using a rental car to drive back to Georgia to avoid hazardous conditions related to the onset of PTSD and accommodate his getting back to work in Georgia safely.

j. Throughout the relevant time period, McCarty reported unsafe communication failures on the part of Director Ronald Cato and numerous counts of harassment from upper-level management and

co-workers created an unsafe work environment. CSX knew of these complaints.

k. In February of 2024, McCarty reported directly to CSX President and CEO Joe Hinrichs, about the harassment, intimidation, and retaliation practices of management for his department.

10. As a result of McCarty's safety complaints, he was subjected to further harassment by CSX supervisors and management, reprimanded, harassed, given a poor performance review, intimidated, threatened, lost his pay raise, and was denied a bonus to which he would have otherwise been entitled.

11. On or about January 22, 2024, as a result of McCarty's pattern of safety complaints as set forth above, McCarty learned that he was given a poor performance review which ultimately affected his compensation. Mr. McCarty disputed the poor performance review internally to CSX.

12. During the relevant period, performance criteria for Mr. McCarty were favorable. McCarty and his team had zero safety violations, collisions, EEO complaints, or union complaints. Mr. McCarty met production and budgetary goals. McCarty's team matched the other teams in the CSX system for performance. However, other production supervisors in roles similar to Mr. McCarty were given bonuses and raises despite negative marks on their performance history, with the

only difference being that Mr. McCarty raised safety issues to upper-level management.

13.    Director Ronald Cato knew of the reports made by McCarty.

14.    Director Ronald Cato had previously warned McCarty not to raise safety issues to CSX Human Resources or elsewhere in the company.

15.    CSX through its management employees, misrepresented facts in order to discipline McCarty, accuse him of wrongdoing, and create a pretextual excuse to unlawfully retaliate against McCarty for protected activities under FRSA.

16.    For the applicable time for which McCarty received a negative performance review, McCarty had a strong record of safety, production, and the other metrics by which his performance would have been measured. McCarty's performance review should have been favorable based on the criteria for evaluation and comparison to his peers within CSX management.

17.    The reasons given for the adverse employment actions toward McCarty by CSX are demonstrably false and pretextual excuses for its own violation of the Federal Railroad Safety Act, 49 U.S.C. § 20109, *et seq.*

18.    Prior to his filing of an FRSA complaint with the Department of Labor, Mr. McCarty notified CSX that he would pursue an FRSA claim for retaliation related to his poor performance review.

19.    On or about July 12, 2024, twelve days after filing his FRSA complaint with OSHA, CSX terminated Mr. McCarty from his management position.

20.    Plaintiff performed his job satisfactorily during his employment with CSX.

21.    McCarty and other employees have been subject to systemic and repeated intimidation tactics to prevent them from reporting safety concerns by management.

22.    As a result of being retaliated against by CSX, McCarty has experienced lost wages and earning capacity due to being given a false poor performance review that disqualified him from a raise and bonus compensation, as well as, mental anguish that he suffered which resulted in lost work.

23.    CSX's acts are discriminatory and retaliatory and due, in whole or in part, to McCarty lawfully reporting unsafe work conditions in good faith and filing an FRSA complaint.

24.    Plaintiff brings his action pursuant to 49 U.S.C. § 20109 which states as follows:

(a)  A railroad Carrier engaged in interstate or foreign commerce, a contractor or a subcontractor of such railroad carrier, or an officer or employee of such railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate

against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done –

(1) To provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security, or gross fraud, waste, or abuse of Federal grants or other public funds intended to be used for railroad safety or security, if the information or assistance is provided to or an investigation stemming from the provided information is conducted by –

(C) a person with supervisory authority over the employee or such other person who has the authority to investigate, discover or terminate the misconduct.

(2) to file a complaint, or directly cause to be brought a proceeding related to the enforcement of this part or, as applicable to railroad safety or security, chapter 51 or 57 of this title, or to testify in that proceeding;

(b) Hazardous safety or security conditions.—

(1) A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for –

(A) reporting, in good faith, a hazardous safety or security condition.

25.    CSX's conduct with respect to Scott McCarty is continuing, malicious and outrageous.

26.    CSX's conduct will deter employees from reporting hazardous safety conditions.

27.    That the intimidation, negative performance review, harassment, and threatening and termination of McCarty was done by CSX as retaliation for his reporting, in good faith, hazardous safety or security conditions and filing an FRSA complaint or CSX's belief that he was about to file an FRSA complaint and ADA complaint.

28.    That CSX should be subjected to punitive damages under §20109 to deter them from continuing to engage in the practice of retaliating those who report workplace safety conditions and concerns.

29.    Upon receiving notice of Mr. McCarty's FRSA complaint, CSX terminated Scott McCarty on July 2, 2024, from his management position at CSX, thereby directly retaliating against him for filing his complaint with the Department of Labor. Mr. McCarty was still on medical leave relating to mental anguish issues that were triggered by the adverse actions taken by CSX which were the subject of his original FRSA complaint. As such, CSX has violated 49 U.S.C. §20109(a)(3) in which a railroad carrier:

> "may not discharge, demote, suspend, reprimand or in any other way discriminate and employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done—
>
> ***
>
> (3)to file a complaint, or directly cause to be brought a proceeding related to the enforcement of this part or, as applicable to railroad safety or security, chapter 51 or 57 of this title, or to testify in that proceeding"

30.    McCarty requests the following remedies for CSX's violations:

a)    lost pay increase and bonus compensation;

b)    the value of lost compensation and bonuses resulting from his negative performance review;

c)    the value of lost fringe benefits with interest;

d)     compensatory damages in an amount of no less than $1,000,000.00;

e)     compensatory damages for emotional distress of no less than $1,000,000.00;

f)     punitive damages for Defendant's conduct in this matter of no less than $250,000.00

g)     litigation costs;

h)     expert witness fees;

i)     reasonable attorney fees; and

j)     reinstatement to his management position.

WHEREFORE, Scott McCarty requests that CSX respond and fully reimburse him for all compensatory losses suffered because of CSX's conduct in retaliating and discriminating against McCarty, reinstate him in a supervisor position, and be assessed reasonable attorney's fees, litigation costs and punitive damages; and for all other relief deemed just and proper.

## COUNT II

### THE FEDERAL EMPLOYERS' LIABILITY ACT, 45 U.S.C. §51, *ET SEQ.*

### PARTIES

31.    Plaintiff is a resident of Clay County, Florida.

32.    Defendant, CSX TRANSPORTATION, INC. ("CSX") is now, and all times mentioned in this complaint was a corporation engaged in the business and

operation of freight transportation in the State of Georgia, as a common carrier by railroad.

## STATUTORY AUTHORITY; JURISDICTION; VENUE

33.    This action against CSX is maintained pursuant to 45 U.S.C.A. § 51, et seq., commonly known as the Federal Employers' Liability Act (FELA). Venue and jurisdiction in this court is proper by virtue of the FELA and Plaintiff received substantial exposure to unsafe work conditions and injury in the CSX's Rice Yard, near Waycross, Georgia and within in the Waycross Division and the Southern District of Georgia.

## STATUTE OF LIMITATIONS

34.    Plaintiff began experiencing constant and severe symptoms of pain, numbness, tingling in both hands, primarily the right hand in February of 2025. Plaintiff's lawsuit complies with 45 U.S.C.A §56. Plaintiff's claim accrued in February of 2025.

## INTERSTATE COMMERCE

35.    Plaintiff alleges that at all times material hereto, Plaintiff as employee, and Defendant as employer, were mutually engaged in services substantially

affecting interstate commerce, and Plaintiff avails himself of all of the privileges, rights and immunities afforded him under the FELA.

## **FACTS SUPPORTING CAUSE OF ACTION UNDER FELA**

36.    Plaintiff began his employment with Defendant on or about August 9, 2021, as a Maintenance of Way employee.

37.    On or about, July 25, 2022, Plaintiff was promoted to the position of System Production Team Supervisor.

38.    In August of 2024, Plaintiff worked for Defendant as a bridge and building maintenance worker.

39.    While under the direct control of Defendant's agents, servants, and employees, Plaintiff sustained severe cumulative bodily injury, which manifested into symptoms in February of 2025.

40.    Plaintiff was required to perform heavy and strenuous work that exposed his hands to pressure on the palms, repetitive movement, forceful exertion, vibration, and non-neutral positions for extended periods of time, and combinations of these exposures causing severe and permanent trauma to his hands and wrists.

41.    The activities required to perform his craft caused tearing, twisting, wrenching, sprain and strain of the tendons, ligaments, joints, nerves and related structures of the soft tissues of his hands.

42.    The unsafe work exposures accelerated, exacerbated and aggravated infirmities, accumulating over time.

43.    The activities aggravated, exacerbated and accelerated tumors that were present in his left hand, and further developed occupational injuries to the left hand.

44.    The cumulative trauma developed Carpal Tunnel Syndrome and other occupational injuries to his right hand.

45.    The cumulative trauma resulted in changes to his hands and wrists. Defendant failed to properly and safely design Plaintiff's work conditions.

46.    Inadequate training, lack of monitoring, lack of supervision, inadequate hand protection, lack of ergonomic job design factors, lack of padding, and failure to implement ergonomic policies and practices recognizing the risk for the development of occupational hand injuries from exposure to repetition, force, vibration and non-neutral hand positions, or combinations thereof for Plaintiff by Defendant caused severe and permanent injuries to Plaintiff's hands.

47.    During the first part of his tenure for the Defendant, Plaintiff was assigned to track maintenance crews using various hand tools, impact wrenches, power tools, claw bars, spike mauls, mundy mauls, track wrenches, rail saws, jacks, handheld hydraulic equipment, plate hooks, rail grinders, and other track tools.

48.    During the first part of his tenure for Defendant, Plaintiff also operated a Tamper Machine with multiple levers, controls and hand maneuvered parts.

49.    During the first part of his tenure for Defendant, Plaintiff manually moved and operated low switch handles, spike pullers, rail saws, claw bars, tie plates, spike drivers, chain saws, grinders, rail drills.

50.    Plaintiff's work required assuming awkward positions and postures to perform strenuous tasks with materials and tools.

51.    Over time, his exposure to these work conditions cumulatively caused dormant changes to his hands, and made him more vulnerable to further trauma, aggravation, exacerbation and acceleration of musculoskeletal disorders known to be caused by his work duties.

52.    After being terminated from his supervisor position, Plaintiff was able to work in the bridge and building department for Defendant.

53.    While in the bridge and building department of Defendant, Plaintiff was assigned to perform duties including painting, paint scraping, floor grinding, wall grinding, and stair grinding.

54.    Plaintiff's duties including painting, paint scraping, floor grinding, wall grinding, stair grinding and other tasks exposed his hands to repetition, vibration, force and awkward wrist postures.

55.    Plaintiff noticed the onset of symptoms while using a large floor grinder that is operated by hand.

56.     The handle of the grinder has no padding and the machine constantly vibrates.

57.     Plaintiff's use of the grinding machine required repetitive hand movements, required awkward turning of the wrists, and required pressure applied to the palms of his hands.

58.     The work performed by Plaintiff required long periods of exposure to occupational risk factors for the development and aggravation of musculoskeletal disorders of the hands and wrists.

59.     These symptoms gradually aggravated, exacerbated and/or accelerated his underlying anatomical changes, cumulative trauma and repetitive strain, making him more susceptible to re-injury.

## **NEGLIGENCE**

60.     The Defendant acting by or through officials, agents, servants, borrowed servants, and employees were negligent in causing the Plaintiff's injury, in whole or in part, in the following particulars:

(a)     Defendant failed to furnish Plaintiff with a reasonably safe place in which to work;

(b)     Defendant failed to furnish Plaintiff with reasonable safe tools and equipment with which to perform his assigned duties;

(c)     Defendant failed to properly supervise and provide its employees with

a proper and safe workplace due to the nature of the work that was being performed by hand;

(d)     Defendant failed to properly maintain the plaintiff's working conditions;

(e)     Defendant failed to warn, train and monitor its workforce regarding cumulative trauma injuries.

(f)     Defendant allowed unsafe work practices to become the standard work practices;

(g)     Defendant failed to implement a proper ergonomics program;

(h)     Defendant failed to provide ergonomically safe mechanical assistance, maintain equipment in a manner to reduce risk factors to workers, padded gloves, padded handles, sufficient breaks, worker rotation, manpower, job design, implement ergonomic devices, and implement preventative ergonomic controls;

(i)     Defendant implemented an unsafe policy regarding its rejection of science related to cumulative trauma disorders;

(j)     Defendant failed to anticipate expected conditions and provide proper safeguards to prevent Plaintiff's injuries;

(k)     Defendant failed to implement a proper floor grinder use protocol and provide adequate assistance to Plaintiff for performing work with the floor

grinder under circumstances that it knew or should have known would put him at an unreasonable risk of injury.

## CAUSATION

61.    As a direct and proximate result of the negligence of Defendant Plaintiff sustained serious disabling injuries to his hands. Plaintiff would show that he was an able-bodied worker capable of performing strenuous manual labor with his hands prior to the events made the basis of this suit, and that the injuries described above have caused Plaintiff to suffer severe physical pain and contributed to his mental anguish.

## DAMAGES

62.    Prior to his injuries, Plaintiff was a strong and able-bodied man who fully performed his assignments as required by Defendant. Plaintiff is unaware of any weaknesses or infirmities that were present before his injuries were discovered and the tumors in his left hand were not affecting his railroad work, but if any were present, the Defendant's negligence caused them to be activated by the trauma and cumulative trauma to Plaintiff's body. Because of Defendant's negligence, Plaintiff has suffered and will continue to suffer damages in the following particulars:

(a)    Plaintiff has undergone medical treatment in the past;

(b)    Plaintiff must undergo medical treatment in the future;

(c)    Plaintiff has sustained physical pain and suffering in the past;

(d)    Plaintiff will continue to experience physical pain and suffering for an indefinite time into the future;

(e)    Plaintiff has sustained mental and emotional pain and suffering in the past;

(f)    Plaintiff will continue to suffer mental and emotional pain and suffering for an indefinite time in the future;

(g)    Plaintiff has incurred medical bills in the past for treatment of his injuries;

(h)    Plaintiff will continue to incur medical bills for an indefinite time into the future;

(i)    Plaintiff has sustained lost benefits and lost wages in the past in the amount of which will be calculated and presented at trial;

(j)    Plaintiff will continue to suffer lost work and earning capacity over his future work life, the amount of which will be calculated and presented at trial;

(k)    Plaintiff has sustained a permanent decrease in his ability to earn wages, the amount of which will be calculated and presented at trial;

(l)    Plaintiff has incurred costs and expenses to maintain this action which he is entitled to recover.

## **REQUEST FOR RELIEF**.

63.    By reason of the above and foregoing, Plaintiff has been damaged in in a sum exceeding the minimum jurisdictional limits of this court. Plaintiff asks that Defendant be cited according to law to appear and answer this lawsuit and, after final trial, Plaintiff seeks the following relief:

(a)    Judgment for all of Plaintiff's actual damages;

(b)    Judgment for post-judgment interest in the highest amount allowed by law;

(c)    Judgment for court costs; and

(d)    Such other relief to which Plaintiff may be entitled.

64.    The amount of monetary relief actually assessed by the jury or judge, however, will ultimately be determined by a jury or judge after hearing all of the evidence of harms, damages and losses.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that upon final trial and hearing, Plaintiff recover from Defendant, CSX Transportation, Inc., damages in accordance with the evidence; costs of court herein expended; post-judgment interest; actual damages; compensatory damages; and such other further relief, both general and special, both at law and in equity, to which Plaintiff may be justly entitled.

PLAINTIFF REQUESTS A TRIAL BY JURY.

Respectfully submitted,

WILKES & MEE, PLLC

*/s/ Alisa D. Wilkes*
Alisa D. Wilkes
GA Bar No. 579280
13400 Sutton Park Dr. S. Suite 1204
Jacksonville, FL 32224
(904) 620-9545
Email: alisa@wilkesmee.com

AND

LAUCK LAW FIRM, P.A.

*/S/Chester H. Lauck III*
Chester H. Lauck, III,
Pro Hac Vice
210 Thayer St.
Little Rock, AR  72205
(501)375-2826
Email: chet@laucklawfirm.com


ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was served via email and/or the Court's ECF system on counsel for the defendant on the 19th day of June 2025:

John A. Wilkerson
Mark E. Toth
Hall, Bloch, Garland & Meyer, LLP
577 Mulberry Street, Suite 1500
P.O. Box 5088 Macon, GA 31208
johnwilkerson@hbgm.com

Joseph C. Devine
E-mail: jdevine@bakerlaw.com
BAKER & HOSTETLER, LLP
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215

Attorneys for Defendant CSX Transportation, Inc.

*/s/Chester H. Lauck III*
Chester H. Lauck III